UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION
CASE NUMBER 6:20-cr-89

. . . . . . . . . . . . . . .
UNITED STATES OF AMERICA, :
Plaintiff, :
v. : Orlando, Florida
March 9, 2021
4:42 p.m.
JAMES LAPIN, :
Defendant. :
. . . . . . . . . . . . . . .

EXCERPT TRANSCRIPT OF JURY TRIAL, VOLUME I
OPENING STATEMENTS
BEFORE THE HONORABLE ROY B. DALTON, JR.
UNITED STATES DISTRICT JUDGE

APPEARANCES:

Counsel for Government: Amanda Sterling Daniels

Chauncey Arthur Bratt

Counsel for Defendant: Michael S. Ryan

Nicole Mouakar

Court Reporter: Amie R. First, RDR, CRR, CRC, CPE
Federal Official Court Reporter
401 West Central Boulevard, Suite 4600
Orlando, Florida 32801
AmieFirst.CourtReporter@gmail.com

Proceedings recorded by Realtime Stenography.

Transcript produced by Computer-Aided Transcription.

**INDEX OF PROCEEDINGS**

Opening Statement by the Government .............. 3

Opening Statement by the Defense ................. 7

P R O C E E D I N G S

*****

**OPENING STATEMENT BY THE GOVERNMENT**

MS. DANIELS: Thank you, Your Honor.

Good afternoon, ladies and gentlemen of the jury.

We are here today because the defendant threatened to kill Speaker of the House Nancy Pelosi in retaliation for her role in the impeachment of Former President Donald Trump.

Specifically, on December 20th, 2019, the defendant called Nancy Pelosi's office in Washington, D.C., and left her a voice mail telling her: "We are fucking coming for you, Cunt. You better have a bulletproof fucking vest on because, Bitch, we're fucking coming for you. We're going to fucking hang your dentures above the fucking Capitol Building. You're fucking dead."

Please excuse this language. These are not my words. They are the defendant's.

During the presentation of evidence, you will hear that the defendant left the Speaker more than one angry voice mail; but that this one, the one on December 20th, crossed the line from an angry voice mail into a criminal threat.

You will hear these voice mails for yourself. And in them you will be able to hear the defendant's tone and

emotion. You'll be able to hear just how serious he was, how these threats are not a joke or a careless remark but a threat intended to intimidate the Speaker. You will be able to tell this from the voice mails themselves.

But you will also be able to determine the defendant's intent from the number of times and ways he attempted to contact the Speaker.

You will hear that over the course of only about two months the defendant called the Speaker not once, not twice, not three times, not four, not even five; but ten times. He left her five voice mails.

He called her at her offices in Washington, D.C., and in San Francisco, California. And he called her during the day, during business hours, all to increase the odds that his words would reach and intimidate her.

You will hear that these voice mails were forwarded to the United States Capitol Police and that a special agent with the United States Capitol Police contacted the defendant on the number that was used to leave the voice mail.

You will hear the interview between the special agent and the defendant. And when you hear this interview, pay close attention to it because in it you will hear that the defendant has the presence of mind to lie to the special agent.

You will hear how when he's confronted with the statements in the voice mail left on December 20th, he has the presence of mind to lie about facts that could be used to identify him. He lies about where he lives, who he lives with, what he drives, and whether he's ever even called the Speaker's office. And you won't have to guess that these statements are lies because you will see the records that prove that these statements are lies.

But this is not the only thing you will hear in this interview. You will hear the defendant's tone and emotion when discussing Speaker Pelosi and the impeachment even months after leaving these voice mails.

And then you will hear the defendant do what only the person who left the voice mails could do. You will hear the defendant correct the special agent about certain statements in the voice mail he left.

You will hear the special agent ask the defendant, "Did you tell Nancy Pelosi she better have a bulletproof vest?" And then you will hear the defendant say, "No, I said I hope she has a bulletproof vest," all on the same call where he claims he's never even called the Speaker's office.

Because even months later he remembers what he said. And he knows it's a threat, not a joke or idle talk or a careless remark, but a threat communicated with the

intent to retaliate against and intimidate the Speaker.

And so when he's confronted about it months later, he knows he has to lie to try to cover up his crime. Because that's what this is. This is a crime.

This is not a case about politics or the First Amendment. Nobody here is going to ask you whether you like Nancy Pelosi or whether you agreed with the impeachment proceedings. And that's important because it's not why you're here.

This is a case about -- this is not a case about anybody's politics. This is a case about a death threat communicated to a government official in retaliation for the performance of her duties.

And at the close of the evidence in this case, there will be no reasonable doubt that the defendant threatened Speaker Pelosi for the performance of her duties.

And at the end of this case, I will stand before you and ask you to return the only verdict that fits the evidence in this case, that the defendant is guilty of the offenses charged.

Thank you.

THE COURT: Thank you, Ms. Daniels.

So while this is happening, ladies and gentlemen, let me tell you I've got several things that I have asked

the lawyers to do and I'm going to ask the witnesses to do as well in an effort to try to keep everybody healthy, is the lawyers are going to replace the microphone cover and wipe it down every time they come and go. It takes a little bit longer, but it's worth it.

Same with the witnesses. I'm going to ask the witnesses to put a microphone cover on, to take it off and deposit it in the trash and to wipe the area down.

So there will be a little bit of delay in between each one of these proceedings which we don't normally have. But as I said, it's all for a good cause.

So, Mr. Ryan, if you're ready, you may proceed.

MR. RYAN: Thank you, Your Honor.

**OPENING STATEMENT BY THE DEFENSE**

MR. RYAN: Good afternoon.

So please examine the voice mails, examine the words, the tone, when they were left, the follow-through, all of the circumstances in this case.

You'll hear testimony that James Lapin is a passionate Trump supporter. He loves Donald Trump. So we're going to have a trial where that kind of issue is part of the case in our deeply divided country today. He's a deep, deep supporter of Donald Trump.

Now, he left five very short voice mails during a very special period of time in our country, during the

impeachment of Donald Trump, the first one. The one on December 2019 that ran through to about February 5th, 2020, when he was acquitted on February 5th, 2020.

So there are five emails -- I'm sorry if I say emails -- five voice mails, but only one is charged in the Indictment. And it's the one that Mr. Lapin left on December 20th, 2019. That's an important date for Mr. Lapin. That is the date that the U.S. House of Representatives voted to impeach Donald Trump.

So there are four other messages, three of them all accuse -- the one before, the day before, you will hear the voice mail in which Mr. Lapin accuses Nancy Pelosi of treason and calls her a traitor and says that she should hang for being a treasonous traitor.

December 20th, he leaves the voice mail that is the subject matter of the Indictment. And you'll have to listen to the words. Examine the words, examine the tone, examine the context.

He says, "We are coming for you. You better have a bulletproof vest on. We are coming for you. We're going to hang your dentures from the Capitol. You're fucking dead."

He never says "I." He never says "me." He never explains how this is happening. Who is the "we" that he's talking about? He's talking about an impersonal "we," the

group that he identifies with, the group of Trump people or the American people, that kind of thing.

The words in context, particularly looking at the other voice mails in which he's accusing Nancy Pelosi of treason and being a traitor, is metaphor. He's speaking in political metaphor. He's talking and warning Nancy Pelosi that she's going to lose her political life, not her physical well-being.

And the tone. Pay attention to the tone. He's ranting. He's ranting. He's raving. He's not trying to instill fear. He's trying to convey his political opinion in no uncertain terms so that you can understand it.

Let's talk about when they were left. They were left in the middle of the day. You just heard the prosecutor say that that was calculated to -- calculated to reach Nancy Pelosi. So somehow leaving messages in the middle of the day on a voice mail system is more calculating to get the messages to Nancy Pelosi. I want you to listen during the trial if you ever hear any evidence about that because I'm not aware of any evidence like that.

The fact that he's leaving the voice mails -- you know one of those voice mails. You know the answers you get. And he's invited to leave his opinion. That's the number he pushes. Push one if you'd like to leave your

opinion for Nancy Pelosi. And there's a few other options. Press two if you'd like her email; press three if you'd like to understand her policy positions; and press four if you're trying to talk to a staffer.

So you're going to hear testimony from the staff that you have to press one in order to even leave a voice mail.

And you're also going to hear that hundreds are left a week, thousands, 3- to 8,000 -- 3- to 5,000. Why would leaving it during the day be more calculating to get it to Nancy Pelosi? I don't understand.

Examine his follow-through and his plan. What was he planning? How was he doing it? Well, there's none. There's no evidence like that. There's no follow-through either.

You'll learn during this trial that he doesn't follow up with an email to the Pelosi offices. He doesn't try to send regular mail to her. He doesn't go to the office.

You're going to hear testimony he's never been to Washington. That the location monitoring -- we're going to have testimony about location monitoring.

I'm sorry. I feel like I sound slurry with this mask on.

So there was no attempt to contact staffers.

He didn't post, you know, ugly memes on Facebook about Nancy Pelosi like with her face in a target or her head in a noose or her head severed from her body.

He didn't go to D.C. He's never been to her San Francisco office, never been to San Francisco.

Another thing is he stops calling altogether on February 5th. February 5th. Mind you, he's not arrested until June 18th. Think about that. How serious of a threat could it be?

Now, you heard the prosecutor count off, he didn't call once, he didn't call twice, he didn't call three times, he didn't call four times; he called ten times.

He called ten times in five days, all during important moments of our impeachment period. And the multiple calls that were received on the same day are within minutes of each other, seconds of each other.

There's three calls on one day. The third one results in a voice mail. So it's five calling events in which all the calls are virtually at the same time.

The Government's reaction to this is also illustrative of the fact that there are no true threats here. He wasn't trying to threaten anyone. He wasn't trying to retaliate against Nancy Pelosi. He's not trying to scare her even. He's not trying to do any of that.

He's one of those people -- and you know them; you

have them in your lives -- who have to express their political point of view no matter what, no matter what group they're in, no matter that they know that the other person is on the other side of the equation.

He just had to get on the phone. He had to get on the phone and tell Nancy Pelosi how fucking dare you impeach the President of the United States, who in his mind is a hero.

First call comes in on December 19th. Second call, the one they consider a threat, came in on December 20th. They don't even retrieve the calls until February 24th.

They get his phone number by around March 5th -- well, they have his phone number right away. They don't call him then. They have -- they get an address for him around March 6th. Still no contact. They run his driver's license information. Still no contact. They don't contact Mr. Lapin until May 18th. May 18th.

So if he's a threat to the Speaker of the House, they're letting him have a lot of leeway if he's that much of a threat.

The Government is slow and unhurried and unurgent with respect to this in and of itself tells you there's no true threat here.

I keep saying "true threat" because the Judge is

going to tell you at the end you have to find that these threats were true threats, meaning the person tried to instill fear, trying to make you believe that they were going to do what they were going to do.

He stopped calling on February 5th. It was a hang-up. That was one of the hang-ups. The last voice mail is January 11th.

This guy is no threat.

The May 18th interview -- you're going to hear testimony about Mr. Lapin. You're going to hear from his sisters. And his sisters are going to tell you that practically since they've known him he's been extremely emotional, high-strung; people say, extra, a keyboard commando, that kind of thing; all talk, no action; all bark and no bite; but somebody who has to tell you his opinion.

And the fact that he just stopped calling on his own, left the last voice mail on January 11th, they don't react until February 24th, they don't even -- it's not even reported until February 24th.

And Agent Anyaso doesn't contact him until May 18th. The May 18th interview, it is absolutely not the case that he didn't explain himself about the voice mails. He does deny them, because he didn't really remember them at that time. He denies them. But he also says he doesn't remember on May 18th.

Agent Anyaso doesn't play the tapes for him. Just play the tapes. Just make it simple. He doesn't. James Lapin is not denying the voice mails. There's nothing about our case that says we didn't actually make the calls.

He knows now that he made the calls. He's listened to them now a couple of times in preparation for this case.

But on May 18th, he's not sure what this guy is talking about. He calls on a spam line. He doesn't know if this person is really an agent. It's a spam line. So, quite frankly, in part, James is just screwing around with the other guy on the other end of the line. He doesn't know.

And what's he do? He calls him up with the thing he's most passionate about, politics, Nancy Pelosi, and Donald Trump. Talk about pushing his buttons.

And he says the same things he said on December 19th and in the subsequent voice mails in January. "Nancy Pelosi is a traitor, and she should be hung for treason." And he explains his philosophy then as well.

Yeah, he variously denies the emails -- voice mails but also says he doesn't remember.

He's spitting back words that the agent has given him about the bulletproof vest. It's a flippant comment.

I mean, it's about a 15-minute interview. That one takes a little bit more time to sort through.

But you have to listen to that one, too, because he didn't deny that the phone was his phone. He didn't deny his name. And he didn't deny his date of birth.

He denies his own partner who he sometimes refers to as his husband. He denies a truck that he owns. He denies an address initially.

But those things don't tell us whether or not he was truly, truly threatening the Speaker of the House rather than just leaving a ranting voice mail expressing political opposition.

At the end of this -- at the end of this, when you examine the words, the tone, the context, and consider Mr. Lapin, the follow-through that doesn't exist, the slow reaction by the government, the fact that he is speaking in political metaphor, he's not threatening Nancy Pelosi. He's speaking in political metaphor expressing his distaste for her, her policies, and her impeachment of Donald Trump.

It was a political rant, not a threat. We'll be asking you to vote not guilty.

THE COURT: Thank you, Mr. Ryan.

*****

(End of Excerpt at 5:03 p.m.)

*****

C E R T I F I C A T E

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

March 31, 2021

s\ Amie R. First

Amie R. First, RDR, CRR, CRC, CPE
Federal Official Court Reporter
United States District Court
Middle District of Florida